UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CEDRIC SIMPSON,

                Petitioner,

    – against –

EARL BELL,

                Respondent.

**MEMORANDUM & ORDER**

18-cv-1378 (ERK)

KORMAN, *J.*:

## I. BACKGROUND

Petitioner Cedric Simpson stabbed his unarmed friend Carl Richardson to death with a pair of scissors after the two had a dispute over $30.  Richardson, who was 19 at the time, came to the barbershop petitioner owned, and at which petitioner also worked, to collect the money that Richardson believed petitioner owed him for a pair of headphones.  ECF No. 11-2 at 324, 338.[1]  Despite the fact that petitioner was fifteen years older than Richardson, the two were friends, had known each other for some time, and had never had any disagreements before.  *Id.* at 336, 338.  This time, however, Richardson and petitioner disagreed about how much money petitioner still owed for the headphones.  *Id.* at 323–24.  Richardson picked up petitioner's iPad, told petitioner that he would hold onto it until he received his

_____

[1] All citations to the record are to the page number in the ECF header, not the internal pagination of the document.

money, and left the barbershop to return to his car, which was parked around the corner and down the block.  *Id.* at 324–25.  Petitioner followed, attempting to persuade Richardson to return his iPad.  *Id.* at 325.

Their interaction on the way back to Richardson's car was captured by two different security cameras.[2]  While the two initially appeared friendly, with petitioner placing his arm on Richardson's shoulder, the encounter soon turned hostile. Petitioner grabbed Richardson's arm and was angrily slapped away.   When Richardson walked back to his car and tried to get in, petitioner physically blocked the door and pushed Richardson back.  The two argued next to Richardson's car for some time, gesturing animatedly.

At one point, they appeared to agree to return to the barbershop.  After a few steps in that direction, Richardson turned around and went back to his car.  Petitioner jogged back after him and again pushed Richardson, who deflected him with his forearm.  Richardson then began opening his jacket as the camera momentarily lost sight of him.  Petitioner later testified that in the moment Richardson was off-camera, Richardson reached toward his waist as if for a weapon and asked "what you want me to do?  Kill you for my money[?]"  ECF No. 11-2 at 325.  Back on camera, the video showed that Richardson had not removed a weapon from his waist.  Instead,

---

[2] The jury viewed this footage—which did not include sound—at trial.  The district attorney provided a copy of the footage, which I have reviewed.

Richardson reached for the door handle of his car and petitioner grabbed Richardson's hand and pushed him away from the door.  Richardson then shoved petitioner back from the car, appeared to make contact with petitioner's face, and pushed him a second time back onto the sidewalk.  Petitioner turned and fled back to the barbershop with Richardson in pursuit.  Significantly, petitioner never claimed that he actually saw Richardson holding a weapon, at this or any subsequent time.

A. *Petitioner Stabs Richardson in the Barbershop*

Because petitioner stabbed Richardson to death and none of the six to nine customers in the barbershop "wanted to help" the police investigation, the only testimony about the events was from two barbers who were working at the shop— whom the prosecutors were forced to call—and the testimony of the petitioner.  ECF No. 11-1 at 436–37.  The first was Sheldon Hunter, who was petitioner's nephew, lived in a home owned by petitioner before and after the incident, and got his job through petitioner, who owned the barbershop and rented Hunter his chair.  ECF No. 11-2 at 178–82.  Hunter saw petitioner and Richardson "running in the shop" after their altercation.  *Id.* at 186.  At first, Hunter thought the two were just "joking" or "playing."  *Id.*  Hunter saw Richardson put petitioner in a "bear hug" near petitioner's station.  *Id.*  Hunter demonstrated Richardson's hold at the trial, which the trial court described for the record as "standing up, using both arms, and he folded them over, and he is grabbing the upper arms, the pectoral muscles, of each of his respective arms."  *Id.* at 187.  Petitioner then "tried to wrestle out of

[Richardson's] hands" and the two "continue[d] to the back of the shop" while "moving side to side." *Id.* at 190.  Hunter saw a pair of scissors in petitioner's hand as he tried to wrestle out of the bear hug. *Id.* at 194.  Hunter went to the front of the shop to calm down his customer—who had left the chair when the fighting started—and by the time he turned his attention back to petitioner and Richardson, their altercation was over and Richardson was bleeding to death. *Id.* at 192.  Hunter claimed he did not see petitioner stab Richardson.

The other barber who testified was John Reid, to whom petitioner rented a chair at the barbershop.  Reid saw Richardson and petitioner run back into the barbershop.  ECF No. 11-2 at 141.  Petitioner returned to his barber station before Richardson put him in a "bear hug" from behind. *Id.* at 142.  Reid testified that Richardson's arms were "wrapped around" petitioner, over the latter's arms. *Id.*  As a result, petitioner's arms were "locked down" and he could not move them. *Id.* at 142–43.  Richardson and petitioner were "fumbling" and "everybody [was] moving" and "trying to get them apart." *Id.* at 143.  Reid saw that "everybody's hands [was] movin' around" and petitioner had "scissors in his hands." *Id.* at 145.  When Reid and others managed to separate the two, he saw that the scissors in petitioner's hand were bloody and that Richardson had blood on him. *Id.* at 146.  Like Hunter, Reid claimed that he did not see the stabbing. *Id.* at 148.

After Hunter and Reid, petitioner testified on his own behalf.  He claimed that Richardson acted "crazy" when they were outside, and that he fled back to the

4

barbershop because he knew it was "much safer inside there." ECF No. 11-2 at 325. Petitioner said that when he got back in the shop, Richardson "pounce[d] on me . . . Grab me from behind trying to put me on the ground. I just want to get out of his hand." *Id.* at 326. Richardson grabbed petitioner and "swung [him] to the right," *Id.* Petitioner testified that he tried to grab onto his barber station, causing items on the station to fall to the ground as the two were "tussling, tussling" and petitioner was "try[ing] to get out of his hand." *Id.* Petitioner then said that he grabbed a pair of scissors remaining on his station, presumably with his free hand, as he and Richardson were "fighting back and forth with him trying to grab me down." *Id.*

The exact sequence of events during the fight was unclear from petitioner's testimony. Petitioner testified that Richardson actually grabbed him "two time[s] in the barbershop"—"one of the time[s] when I reach the station and grab the scissors and he come back over and grab me again." ECF No. 11-2 at 365. Petitioner claimed that during one of these periods, Richardson grabbed him "underneath" his arms rather than locking them to his sides as Reid and Hunter testified, which would presumably have left his hands free to stab Richardson. *Id.* at 364–65. Petitioner also claimed that Richardson "tried to hold me in between [] two chairs." *Id.* at 327. Then, petitioner said "I don't know how I get so strong, but I get up back on my feet.

I balance up myself.  I come to the middle of the shop fighting, going down to the back of the shop." *Id.*

As Richardson was holding him down "trying to drop [him] down on the floor," petitioner swung the scissors three times because he "want[ed] to get away from [Richardson]." *Id.*  Although expert testimony established that Richardson's fatal wound was very slightly to the left of the middle of his chest between the second and third ribs, petitioner claimed that he only swung his "hands three times over my shoulder and under my arm" while Richardson was behind him, and that he did not know if he had stabbed Richardson because "[w]hen you stab somebody, you go in front of somebody and stab them.  I didn't do that." *Id.* at 335.[3]  Petitioner claimed that he was "scared for [his] life" as the fight unfolded and that all he wanted to go was "get away." *Id.* at 329.  He also claimed that he thought Richardson "had a weapon in his hands," but he never testified that he actually saw a weapon, even though he would easily have been able to see anything in Richardson's hands when they were wrapped around him. *Id.* at 362–63.  Instead, he claimed that he only learned that Richardson was unarmed after stabbing him. *Id.*

---

[3] Indeed, not only did petitioner suggest that he did not know he had stabbed Richardson—this argument was also made by his attorney in his summation.  ECF No. 11-2 at 415–18.  And yet there was never any doubt that petitioner stabbed Richardson.

Richardson initially appeared not to realize how serious his wounds were. Reid testified that after the two were separated, Richardson was "[j]ust walking around" the shop. ECF No. 11-2 at 149. At some point Richardson put his hand on petitioner's shoulder and said something like "you're going to kill me for like $80?" *Id.* Petitioner responded that Richardson should "just chill" before leaving to retrieve his iPad. *Id.* at 150. The video footage from this time shows petitioner calmly jogging back to Richardson's car and picking up the tablet from where Richardson had dropped it during their initial confrontation. Back inside, Richardson lifted up his shirt and Reid and Hunter saw that he was bleeding. *Id.* at 151, 196. Richardson said that he did not "want to die" and asked those present to "pray for me" before falling down on the barbershop's waiting bench. *Id.* at 151. The petitioner then came back in and asked Richardson if he wanted to go to the hospital. *Id.* at 153. Ultimately, Richardson dialed 911 because he thought "he [was] going to die" and handed the phone to Hunter. *Id.* at 196–97. Reid separately called 911. *Id.* at 153. While paramedics transported Richardson to the hospital and unsuccessfully attempted to save his life, video footage showed that petitioner was walking into a bodega next door, calmly browsing the shelves and chatting with other customers.

Petitioner was eventually arrested after he returned to the barbershop and Reid pointed him out to police. ECF Nos. 11-1 at 404; 11-2 at 157. As an officer was placing petitioner in his car, petitioner volunteered that "I stabbed him because he

7

was trying to attack me." ECF No. 11-1 at 440. After he was read his *Miranda* rights, petitioner told a detective that "Richardson put him in a hug so he grabbed the pair of scissors to get him off." ECF No. 11-2 at 79. The detective then demonstrated the motion petitioner made in the interview by moving his right hand "in an up and down manner in front of him . . . [i]n a striking motion." *Id.*

At trial in January 2015, the medical examiner testified that Richardson received four wounds: two on the "neck on his left side close to the base of the neck," one to the chest, and the last "[o]n his left side of the upper back in the area where, roughly in the area where the arm joins the torso." ECF No. 11-2 at 234–35. The two wounds on the neck resulted from a single stabbing motion of the two blades of an open pair of scissors. *Id.* at 250. The medical examiner placed the fatal wound "very slightly to the decedent's left of the midline," which she described as "an imaginary line that goes through the center of our body." *Id.* at 235. She also stated that the "course and direction" of the fatal wound was "oriented from decedent's front to back, from his left to right and downwards," with the scissors entering "through the second intercostal space," which falls between the second and third rib.[4] ECF No. 11-2 at 240–41.

---

[4] Intercostal spaces are spaces between the ribs and are numbered by adjoining rib. For a diagram, *see* Danuel V. Laan et al., *Chest Wall Thickness and Decompression Failure: A Systematic Review and Meta-analysis Comparing Anatomic Locations in Needle Thoracostomy* 47 INJURY 797 (2016).

At the close of the prosecutor's case, petitioner's counsel unsuccessfully moved for an order of dismissal on the ground that the prosecution had failed to show "that there was an intent to kill," ECF No. 11-2 at 315—an essential element of the only homicide charge in the indictment. After petitioner testified as described above, petitioner's counsel again moved for an order of dismissal because no "reasonable jury could infer that [petitioner] intended to kill [Richardson]" and the prosecution had "not proven each and every element of the crime." *Id.* at 381. The trial court again denied the motion. *Id.*

The trial court instructed the jury on the elements of murder in the second degree (causing death with intent to kill) and the lesser-included crimes of manslaughter in the first degree (causing death with intent to cause serious physical injury) and second degree (recklessly causing death). Petitioner's trial counsel opposed the first-degree manslaughter instruction but stated that he "would accept" second-degree manslaughter as a lesser-included charge. ECF No. 11-2 at 395. The instructions for each substantive homicide offense listed lack of justification as one of the elements that the prosecution had to prove beyond a reasonable doubt. *Id.* at 471, 473, 475. Consistent with the criminal pattern jury instructions, the trial court also effectively restated the justification element in each of the three homicide charges, telling the jury that "if you find that the [prosecution has] failed to prove beyond a reasonable doubt that the [petitioner] was not justified, then you must find

the [petitioner] not guilty of murder in the second degree and/or manslaughter in the first and second degrees." *Id.* at 467.

During deliberations, the jury sent the trial court a note asking for "[t]he legal definition of self-defense." ECF No. 11-3 at 9. The trial court told the jury that "[w]ith respect to count one and the lesser included offense of manslaughter in the first and second degrees [petitioner] has raised the defense of justification also known as self-defense." *Id.* at 10. It then repeated the justification instructions (described above) in full. *Id.* at 10–14. The jury returned a verdict of not guilty on the murder count and guilty on first-degree manslaughter and a related count of criminal possession of a weapon in the fourth degree (a count that is not at issue here). *Id.* at 15. Petitioner was sentenced principally to 19 years on the manslaughter count and one year on the criminal possession count to run concurrently. *Id.* at 44.

Petitioner's counsel raised three grounds on direct appeal. First, he argued that the evidence was insufficient to support his manslaughter conviction or disprove his justification defense and that the verdict was against the weight of the evidence. Next, he claimed the prosecutor improperly commented on his justification defense and pre-arrest silence during closing. Finally, he contended that his sentence was excessive.

The Appellate Division agreed with the argument of petitioner's counsel that the sentence was excessive and reduced it from 19 to 15 years, which was within the range that petitioner could have received if he had been convicted of the lesser

offense of manslaughter in the second degree. *People v. Simpson*, 151 A.D.3d 762, 762 (2d Dep't 2017), *leave denied* 30 N.Y.3d 1063 (2017); *see* N.Y. Penal L. §§ 70.00(2)(c), 125.15.  The Appellate Division, however, held that petitioner had "failed to preserve for appellate review his contention that [the prosecution] failed to disprove the defense of justification," but that, in any event, the evidence was sufficient to disprove justification and to prove petitioner's intent to inflict serious physical injury.  151 A.D.3d at 762–63.  While holding that some of the prosecutor's comments were improper, it held that the trial judge's instructions cured some of the defects and that the others were not sufficiently egregious to deprive petitioner of his right to a fair trial.  *Id.* at 763.

Petitioner pursued two *coram nobis* petitions.  In the first, he argued that appellate counsel was ineffective for failing to argue that the evidence was insufficient to prove his intent to inflict serious physical injury or that trial counsel was ineffective for failing to preserve the issue.  The Appellate Division denied the petition.  *People v. Simpson*, 164 A.D.3d 1477 (2d Dep't 2018), *leave denied* 32 N.Y.3d 1115 (2018).

In petitioner's second *coram nobis*, he argued that appellate counsel was ineffective for failing to argue that the trial court should have instructed the jury to stop deliberating if it found him not guilty of the murder charge because the prosecution had failed to disprove justification, or that trial counsel was ineffective for failing to object to the justification instruction.  Petitioner also claimed that

appellate counsel should have argued that (1) the trial court erred by refusing to give a separate instruction on justification that his trial counsel requested, and (2) he was actually innocent of manslaughter because (he claims) the jury must have acquitted him of murder on justification grounds. The Appellate Division again denied relief. *People v. Simpson*, 174 A.D.3d 825 (2d Dep't 2019), *leave denied* 34 N.Y.3d 984 (2019).

## II. DISCUSSION

A. *Ineffective Assistance of Counsel*

Petitioner's ineffective assistance of counsel claims are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984), which places the burden on petitioner to demonstrate (1) that his counsel's representation "fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694; *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Indeed, "[b]ecause the *Strickland* standard is a general standard," after AEDPA "a state court has even more latitude to reasonably determine that a defendant has not" established that he has received the ineffective assistance of counsel. *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (*per curiam*) (internal quotation omitted). The shorthand is "double deference": first, the deference owed under the *Strickland* standard, and the second owed to the state-court decision under AEDPA.

All of petitioner's ineffective assistance claims were raised in his two *coram nobis* petitions. The Appellate Division rejected those claims in two separate opinions, *see* 174 A.D.3d at 825 & 164 A.D.3d at 1477, with a citation in each to *Jones v. Barnes*, 463 U.S. 745 (1983), the "most relevant Supreme Court case governing ineffective assistance of appellate counsel," *Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015), although it did not specifically analyze the facts under the *Barnes* standard. Nevertheless, the Appellate Division's application of *Barnes* is owed considerable deference under AEDPA. *Id.* at 117–18.

In applying that deferential standard, the Supreme Court has held that appellate counsel has no duty to raise every non-frivolous issue. *Barnes*, 463 U.S. at 751. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52. Reviewing courts "may not use hindsight to second-guess" appellate counsel's strategic choices. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). "[C]hallenges to appellate counsel's effectiveness are viewed in light of the law existing at the time counsel was required to file the brief on appeal." *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001). "Counsel is not required to forecast changes in the governing law." *Mayo*, 13 F.3d at 533. Courts must apply "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Chrysler*, 806 F.3d at 123 (internal quotations omitted). And even if the performance

of counsel is found to be deficient under this deferential standard of review, a defendant may obtain relief only if there is "a reasonable probability that his claim would have been successful" in overturning the conviction or otherwise obtaining meaningful relief. *Mayo*, 13 F.3d at 534 (internal quotation omitted).

### 1. *"Stop Deliberations" Charge*

Petitioner claims that appellate counsel should have argued that he was entitled to a "stop deliberations" charge instructing jurors not to consider lesser homicide counts if they acquitted petitioner of murder on justification grounds. The New York Court of Appeals has not yet addressed whether such an instruction is required under state law. Some, but not all, of the Appellate Divisions have required (at one time or another) an added instruction that an acquittal of the top count on justification grounds precludes consideration of lesser-included offenses. Nevertheless, there is a significant split between the Departments as to the necessity of such a charge,[5] and a dispute even within Departments that recognize it about whether to apply it, which is discussed below.[6]

---

[5] *Compare People v. Daniels*, 174 A.D.3d 955, 957–58 (3d Dep't 2019) (reversing a conviction based on failure to give a stop-deliberation instruction), *leave denied* 34 N.Y.3d 950 (2019); *with People v. Bolling*, 24 A.D.3d 1195, 1196–97 (4th Dep't 2005) (rejecting such a rule), *aff'd on other grounds* 7 N.Y.3d 874 (2006).

[6] *Compare People v. Velez*, 131 A.D.3d 129, 133–34 (1st Dep't 2015) (reversing a conviction in the interest of justice based on the trial court's failure to give a stop-deliberation instruction) *with People v. Macon*, 186 A.D.3d 430, 431 (1st Dep't 2020) (holding exactly the opposite while recognizing that it had "changed

a.  <u>The Availability of Habeas Review for State-Court Errors</u>

The threshold issue here is whether petitioner can pursue an ineffective assistance claim under AEDPA based on his counsel's alleged failure to challenge errors of state law, where the state-law errors do not rise to the level of an independent federal constitutional claim.  The two leading Second Circuit cases that address this question were decided before AEDPA and answered it in the affirmative.  *See Claudio v. Scully*, 982 F.2d 798 (2d Cir. 1992); *Mayo v. Henderson*, 13 F.3d 528 (2d Cir. 1994).

In *Claudio v. Scully*, the Second Circuit held that counsel's "failure to raise a meritorious state law claim" could violate the Sixth Amendment.  982 F.2d 798, 803 n.5 (2d Cir. 1992).  As Judge Jon Newman observed in the course of his dissent, that was "a significant ruling, not yet made by the Supreme Court, nor by any prior decision of this Court" and was "not free from doubt."  *Id.* at 807–08.  As he explained, "[i]t is arguable that the federal guarantee of effective assistance of

---

course" and no longer applied the rule in *Velez*), *leave denied* 35 N.Y.3d 1114 (2020); *but see People v. Herrera* 193 A.D.3d 189, 192–93 & n.* (1st Dep't 2021) (reversing conviction in the interest of justice based on failure to give stop-deliberations instruction under *Velez*).  *Compare also People v. Feuer*, 11 A.D.3d 633, 634–35 (2d Dep't 2004) (reversing a conviction in the interest of justice based on failure to give stop-deliberation instruction) *with People v. Palmer*, 34 A.D.3d 701, 703 (2 Dep't 2006) (concluding that the *Feuer* rule was "served by charging in accordance with the [criminal] pattern jury instructions, which require that the absence of justification be made a specific element of *each* of the submitted charges") (emphasis in original), *leave denied* 8 N.Y.3d 848 (2007) *and People v. Brooks*, 71 A.D.3d 1043 (2d Dep't 2010) (applying *Palmer*), *leave denied* 16 N.Y.3d 828 (2011).

counsel, whether protected by the Sixth Amendment through the Due Process Clause or directly by that Clause, assures state court defendants only effective assistance of counsel in enforcing the protections of federal law, leaving entirely to the states all questions as to whether counsel's performance was adequate to assure vindication of state law protections." *Id.* at 807–08.  Shortly thereafter, in *Mayo v. Henderson*, the Second Circuit followed *Claudio* and held that "[t]he claim whose omission forms the basis of an ineffective assistance claim may be either a federal-law or a state-law claim," so long as the failure to raise the state claim "fell outside the wide range of professionally competent assistance."  13 F.3d at 533.

The Second Circuit has continued to apply these cases on habeas review after the passage of AEDPA notwithstanding the Supreme Court's repeated admonition that only its holdings, and not those of the Courts of Appeals, can create clearly established law.  Thus, in *Carey v. Musladin*, the Supreme Court observed that "[n]o holding of this Court required the [state] Court of Appeal to apply the test of [prior holdings to the] conduct [relevant] here.  Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law."  549 U.S. 70, 77 (2006).  Similarly, in *Rodriguez v. Miller*, the Second Circuit made it clear that "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief."  537 F.3d 102, 106–07 (2d Cir. 2008).

Thus, even if *Claudio* and its progeny continue to state the law of this Circuit, they should not be applied after AEDPA because the Supreme Court has not held that counsel can be ineffective for failing to challenge state-law errors. And Judge Jon Newman regarded this as a serious issue for which there was no Supreme Court precedent. 982 F.2d at 807–08. Indeed, the Second Circuit has held that, even when it has construed the Constitution in a particular way "as a matter of federal law in this circuit," it nonetheless "seems likely that under the AEDPA, a state court" that charted a different path would be applying Supreme Court law "in a perfectly reasonable way." *Kennaugh v. Miller*, 289 F.3d 36, 47–48 (2d Cir. 2002).[7]

Under these circumstances, it would be passing strange to grant habeas relief based on counsel's failure to challenge errors of state law when the same conduct would not violate petitioner's right to a fair trial under federal law—or even under state law, as detailed below. Still, the Second Circuit has continued to apply *Claudio*'s rule following the passage of AEDPA, albeit while relying on pre-AEDPA cases and without grappling with the concerns raised here, *see, e.g.*, *Lynch v. Dolce*,

---

[7] Specifically, in an earlier case, the Second Circuit held that, under *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972), independent evidence corroborating the defendant's guilt was irrelevant to the determination of whether a witness identification was admissible. *Raheem v. Kelly*, 257 F.3d 122, 140–41 (2d Cir. 2001). Yet the Second Circuit subsequently held that although it had rejected this so-called "sixth factor" (that independent evidence of guilt could support the reliability of a witness identification), under AEDPA, a "state court that used a 'sixth factor' analysis would be applying the *Manson* requirements in a perfectly reasonable way." *Kennaugh*, 289 F.3d at 47–48.

789 F.3d 303, 311 (2d Cir. 2015) & *Sellan*, 261 F.3d at 310, and thus my decision is not based on this ground alone.

   b.  <u>New York's Standard for Inconsistent Verdicts</u>

   As earlier explained, the stop-deliberations rule, as formulated by some decisions of the Appellate Divisions, requires the trial court to instruct the jury that an acquittal of the top count on justification grounds precludes consideration of lesser-included offenses.  The rationale for this judicially-created rule is that, absent the instruction, the Appellate Division "cannot say with any certainty and there is no way of knowing whether the acquittal on the murder counts was based on a finding of justification."  *People v. Feuer*, 11 A.D.3d 633, 635 (2d Dep't 2004).  So what? The Appellate Division never explained.  Presumably, the Appellate Division was concerned that the jury verdict might be inconsistent and that the guilty verdict on the lesser-included offenses would have to be set aside.

   *Feuer* and cases like it are based on a fundamental misunderstanding of the extraordinary limit that the New York Court of Appeals has placed on the application of its rule regarding inconsistent verdicts.  Specifically, it has held that verdicts may only be set aside as inconsistent or "repugnant" when "the jury, *as instructed*, must have reached an inherently self-contradictory verdict."  *People v. Tucker*, 55 N.Y.2d 1, 8 (1981) (emphasis added); *see also People v. DeLee*, 24 N.Y.3d 603, 608–09 (2014).  "Given that premise, a verdict is repugnant only if it is legally impossible— under all conceivable circumstances—for the jury to have convicted the defendant

on one count but not the other, and, if there is a possible theory under which a split verdict could be legally permissible, it cannot be repugnant, regardless of whether that theory has evidentiary support in a particular case." *DeLee*, 24 N.Y.3d at 608 (internal quotation omitted). The Court of Appeals gave the following example in *Tucker*: the verdict is inconsistent when "a defendant is charged with two crimes: charge 1 requires proof of elements A, B and C; charge 2 requires proof of elements A, B, C and D. A conviction on charge 2 would be repugnant to an acquittal on charge 1 as the latter verdict would necessarily involve a finding that at least one of the essential elements of charge 2 was not proven." *Tucker*, 55 N.Y.2d at 6 n.2.[8] Under the *Tucker* rule, the verdict in the present case cannot be inconsistent. As New York courts have held, an acquittal for murder is not inconsistent with a conviction for manslaughter because those crimes contain different *mens rea* elements, namely that a conviction for murder requires the prosecution to prove that a defendant intended to cause death, while a conviction for first-degree manslaughter only requires proof that he intended serious physical injury. *People v. Adames*, 42 A.D.3d 328, 329–30 (1st Dep't 2007), *leave denied* 9 N.Y.3d 1030 (2008).

---

[8] By contrast, the Supreme Court has held that even a jury's self-contradictory verdict (as determined based on the jury instructions) would not be a basis to overturn a conviction. *See People v. Muhammad*, 17 N.Y.3d 532, 538 (2011) (citing *United States v. Powell*, 469 U.S. 57, 63 (1984)).

Nor would it matter if the jury's verdict resulted from its failure to follow the instructions, because as the New York Court of Appeals has explained, the jury is "free to extend leniency and may decide not to convict a defendant of one or more charges notwithstanding the court's legal instructions." *People v. Muhammad*, 17 N.Y.3d 532, 539 (2011). Thus, "a jury may freely reject evidence and exercise its mercy function by rendering a verdict that appears to be factually illogical." *Id.* Again, the only thing that matters is whether "the jury, *as instructed*, must have reached an inherently self-contradictory verdict." *Tucker*, 55 N.Y.2d at 8 (emphasis added). The stop-deliberations instruction functions as an unnecessary and inappropriate end-run around the appropriate mechanism for evaluating allegedly inconsistent verdicts set forth in *Tucker* and its progeny. Perhaps for that reason, the New York cases on this issue are erratic and inconsistent, and the Court of Appeals has never embraced such an instruction. *See supra* nn.5–6.

### c. The Modification of the Stop-Deliberation Instruction

Even the Second Department has ultimately recognized that a specific stop-deliberations instruction is not necessary and that its purpose was "served by charging in accordance with the [criminal] pattern jury instructions, which require that the absence of justification be made a specific element of *each* of the submitted charges." *People v. Palmer*, 34 A.D.3d 701, 703 (2d Dep't 2006) (emphasis in original), *leave denied* 8 N.Y.3d 848 (2007); *accord People v. Brooks*, 71 A.D.3d 1043 (2d Dep't 2010) (citing *Palmer* and pattern jury instructions), *leave denied* 16

N.Y.3d 828 (2011).  Significantly, *Palmer*'s modification of the *Feuer* rule has been adopted by the First Department.  Thus, in *People v. Barreto*, the First Department declined to review an unpreserved challenge to a justification charge and held in the alternative, relying on *Palmer*, "that the justification charge, viewed as a whole, sufficiently conveyed the principle that if the People did not disprove the defense of justification beyond a reasonable doubt, defendant was entitled to an acquittal as to all counts" and that "[t]he charge could not have misled the jury with regard to the relationship between the charges and the justification defense."  70 A.D.3d 574, 575 (1st Dep't 2010), *leave denied* 15 N.Y.3d 772 (2010).  Similarly, in *People v. Melendez*, it held that a justification instruction that clarified that justification was an element of the relevant offenses "adequately conveyed that acquittal of a greater charge precludes consideration of lesser offenses that are based on the same conduct" and that any error was harmless given "overwhelming evidence disproving the justification defense."  195 A.D.3d 447, 448 (1st Dep't 2021) (internal quotations omitted); *see also People v. White*, 66 A.D.3d 585, 586 (1st Dep't 2009), *leave denied* 14 N.Y.3d 807 (2010); *Love v. Smith*, 2009 WL 2422384, at *7 (E.D.N.Y. Aug. 6, 2009).  Thus, all that should survive of the stop-justification instruction is the *Palmer*/*Brooks* holdings that the instructions must make clear that justification is an element of all the relevant offenses—and no more than that.

The instructions here do just that.  They told the jury that the prosecution needed to disprove justification beyond a reasonable doubt as a substantive element

of each homicide count.  ECF No. 11-2 at 463, 467, 471–72.  In accord with the pattern jury instructions, the trial court also told the jury that "if you find the People have failed to prove beyond a reasonable doubt that the defendant was not justified, *then you must find the defendant not guilty of murder in the second degree and/or manslaughter in the first and second degrees.*"  *Id.* at 467 (emphasis added).[9]  "Jurors are presumed to follow the legal instructions they are given," and the trial court's instruction left no room for jury confusion. *People v. Baker*, 14 N.Y.3d 266, 274 (2010); *see also Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  If juries follow the instructions they are given, and there is no reason to suggest that they did not here, then a stop-deliberation charge provides no more certainty that the jury will follow that instruction.  Both the instruction that was given and the stop-deliberation charge in essence tell the jury the same thing: they may not convict if the jury has concluded that the prosecution has failed to disprove justification beyond a reasonable doubt.

I could stop here and deny the writ for the same reason that other New York cases have held that the charge given here satisfies the rationale of *Feuer*.  And the

---

[9] Petitioner argues that the conjunction "and/or" rendered the instruction ambiguous, but "the words 'and/or' commonly mean 'the one or the other or both.'" *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 627 (1st Cir. 1981); *see also* Cambridge Dictionary of American English, "and/or" ("used to refer to both things or either one of the two mentioned").  In this context, those words clearly conveyed that the justification defense applied to *each* homicide charge individually, meaning that if the jury found petitioner justified then it must acquit him of *both* murder and manslaughter.

Appellate Division's decision here denying coram nobis relief could reasonably have rested on that ground, and more significantly could have concluded that appellate counsel was not ineffective for failing to press this argument or that there was no reasonable probability that it would have affected the outcome. *See Chrysler*, 806 F.3d at 117. Under these circumstances, it is not necessary for me to engage in a lengthy analysis of the evidence in this case. Nevertheless, although unnecessary, I believe such a discussion will be helpful to explain why petitioner's ineffective assistance of counsel claim would fail even under a strict application of *Feuer*, one that ignores the gloss placed on it by many of the Appellate Division decisions.

This claim fails for two reasons. First, petitioner "encounters an obstacle that may be insurmountable in any case of ineffective assistance of appellate counsel and certainly is in this one," *Cruz v. Kirkpatrick*, 2017 WL 3382069, at *5 (E.D.N.Y. Aug. 4, 2017)—that the claim was procedurally forfeited on direct appeal. *See Chrysler*, 806 F.3d at 123. As a result, he cannot establish that appellate counsel was ineffective for failing to raise the issue. *See Jameson v. Coughlin*, 22 F.3d 427, 429 (2d Cir. 1994) ("The Sixth Amendment does not require appellate counsel to . . . press meritless arguments before a court") (internal quotation and alteration omitted).

Nevertheless, the Appellate Division was aware that justification was an issue in this case and could have chosen to review the adequacy of the stop deliberation instruction in the interest of justice on its own motion, *see Claudio*, 982 F.2d at 800,

if it was persuaded that "there is a reasonable basis for the fear that injustice has been done," *People v. Semione*, 235 N.Y. 44, 46 (1923), the recognized standard for invoking interest-of-justice jurisdiction. Yet it chose not to. Indeed, the Second Department has repeatedly declined to reach unpreserved claims that a stop-deliberation charge should have been given, both before and after petitioner's appellate counsel filed his brief in November 2016. *See Palmer*, 34 A.D.3d at 701; *People v. Holmes*, 12 A.D.3d 532, 532 (2d Dep't 2004), *leave denied* 4 N.Y.3d 764 (2005); *People v. Jung*, 22 A.D.3d 506 (2d Dep't 2005), *leave denied* 5 N.Y.3d 883 (2005); *Brooks*, 71 A.D.3d at 1043; *People v. Peterkin*, 23 A.D.3d 678, 679 (2d Dep't 2005), *leave denied* 6 N.Y.3d 779 (2006); *People v. Soto*, 31 A.D.3d 793, 793 (2d Dep't 2006), *leave denied* 7 N.Y.3d 904 (2006); *People v. Gueye*, 81 A.D.3d 974 (2d Dep't 2011), *leave denied* 17 N.Y.3d 795 (2011); *People v. Fitzgerald*, 120 A.D.3d 506, 507 (2d Dep't 2014), *leave denied* 24 N.Y.3d 1083 (2014); *People v. Louis*, 153 A.D.3d 728 (2d Dep't 2017), *leave denied* 30 N.Y.3d 981 (2017); *People v. McGriff*, 175 A.D.3d 1432, 1433 (2d Dep't 2019), *leave denied* 34 N.Y.3d 1018 (2019). Six of these cases narrow the application of *Feuer* by relegating it to a "*cf*" cite, suggesting that the Appellate Division did not read the failure to give this stop-deliberation charge as causing a "reasonable basis for the fear that injustice has been done." *Feuer*, 11 A.D.3d at 634 (quoting *Semione*, 235 N.Y. at 46).

Particularly in this case, there was little evidence—other than petitioner's self-serving, evasive and contradictory testimony—supporting an inference that he was

in danger of death or serious physical injury, and less evidence that any such fear was objectively reasonable (as was required for justification).  The victim was unarmed, and petitioner did not testify that he ever saw a gun.  ECF No. 11-2 at 362–63.  No such testimony was given by any other witness.  Nor was the victim in any way assaulting petitioner.  On the contrary, the victim had him in a "bear hug" in what appeared to be an effort to avoid being stabbed by the scissor-wielding petitioner.   My view of the evidence—having read the entire transcript as summarized in detail above—is that if anyone was acting in self-defense it was Richardson, who was trying to prevent petitioner from stabbing him with a pair of scissors, which he grabbed <u>before</u> he was put in a bear hug.  The evidence showed that "the victim used, at most, ordinary physical force, and not deadly physical force" that would justify petitioner stabbing Richardson to death.  *People v. Davis*, 176 A.D.3d 634, 635 (1st Dep't 2019).  In sum, it was likely that the Second Department declined to review this unpreserved claim—as it had declined to do in similar cases—either because it believed the trial court's instructions were sufficient to satisfy the rationale of the stop-deliberations rule or because of the quality of the evidence supporting the justification defense.

      d.  <u>Whether Appellate Counsel Was Ineffective for Failing to Argue that Trial Counsel Was Ineffective</u>

Unlike his first claim of ineffective assistance of appellate counsel, which is predicated on the failure to argue that the trial judge should have given a stop-

deliberation instruction even if not requested, petitioner argues in the alternative that his appellate counsel should have argued that trial counsel was ineffective because he did not request a stop-deliberation instruction and thereby failed to preserve the issue. Preservation would not have been an issue on appeal if trial counsel had requested such an instruction. If trial counsel had done so, there is no reason to believe that such a charge would not have been given. Indeed, petitioner has not pointed to any case—nor have I found one—where trial counsel has requested a stop-deliberations charge but where the trial court declined to give it. To the contrary, in all of the cases I have found, the Appellate Division has either noted that the request was not preserved (and therefore reviewed it only in the interest of justice) or failed to note whether there was a timely request.

Nevertheless, even if such an instruction had been requested and not given, the Appellate Division could reasonably have concluded that there was no reasonable probability that the failure to do so would have affected the jury's verdict. The instructions that were given were consistent with the pattern jury instructions and the previous decisions of the Appellate Divisions in *Brooks* and *Palmer*, as well as *White*, *Barreto*, *Davis*, and *People v. Macon*, 186 A.D.3d 430, 431 (1st Dep't 2020), *leave denied* 35 N.Y.3d 1114 (2020). The language in *Barreto* is apt and worth repeating: "the justification charge, viewed as a whole, sufficiently conveyed the principle that if the People did not disprove the defense of justification beyond a reasonable doubt, defendant was entitled to an acquittal as to all counts" and that

"[t]he charge could not have misled the jury with regard to the relationship between the charges and the justification defense." 70 A.D.3d at 575. Indeed, in a recent opinion, an able district judge held that a similar jury charge "adequately conveyed" that it was an element of each count that the defendant must not have been justified in order to convict. *Harden v. Fields*, 2021 WL 2439144, at *5 (N.D.N.Y. June 15, 2021). "[T]he jury necessarily found that the People proved beyond a reasonable doubt that [p]etitioner was not justified as to any count when it found [p]etitioner guilty of the lesser-included crime. . . . As the Supreme Court has observed, courts 'generally presume that jurors follow their instructions.'" *Id.* (quoting *Penry v. Johnson*, 532 U.S. 782, 799 (2001)).

In sum, petitioner's argument that appellate counsel was ineffective for failing to argue that a stop-deliberations instruction should have been given fails for at least four reasons. First, the Supreme Court has not held that the federal constitutional right to effective assistance of counsel can be used to challenge counsel's decision not to argue a claim under state law, particularly where that claim does not implicate petitioner's right to a fair trial. Second, the *Feuer* rule is wholly inconsistent with the New York Court of Appeals' cases on inconsistent verdicts. Third, the Second Department has held that the rationale of the stop-deliberations rule is satisfied where, as here, the trial court instructed the jury that justification was an element of each offense. And finally, petitioner cannot evade his trial counsel's failure to preserve this argument by arguing that trial counsel was ineffective for doing so,

precisely because there is no reasonable probability that the requested instruction would have altered the verdict.

### 2. *Eighth Amendment*

Petitioner argues that "the jury found me justified as to the murder in the second degree" and that appellate counsel should therefore have argued that his incarceration constituted cruel and unusual punishment because he was actually innocent of the lesser included homicide counts. Petitioner's assertion that the jury found him justified is baseless. As discussed above, the jury acquitted him of murder but convicted him of manslaughter, which also included as an element that his action "was not justified." ECF No. 11-2 at 463, 467, 473. Appellate counsel was not ineffective for declining to raise this meritless argument. Indeed, "the Supreme Court has not finally resolved whether there is a federal constitutional right to be released on proof of actual innocence," *Cassadean v. LaManna*, 2021 WL 2809982, at *3 (E.D.N.Y. July 6, 2021), and petitioner could not obtain habeas relief on that basis. *See Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

### 3. Goetz *Charge*

Petitioner claims that appellate counsel should have argued that he was deprived of his right to present a defense by the trial court's refusal to give a charge using language taken from *People v. Goetz*, 68 N.Y.2d 96 (1986). Petitioner requested a charge that "the standard to be followed by a jury in determining whether a belief was reasonable is that of a man of ordinary courage in the circumstances

surrounding the defendant at the time of the killing." 68 N.Y.2d at 109 (internal quotation omitted). The trial court explained that "the Court of Appeals[] has never used or defined this so-called man of ordinary courage clause nor has it been mentioned again anywhere in the rest [of the *Goetz* opinion]," or included in the pattern jury instructions. ECF No. 11-2 at 399–400. Indeed, the language petitioner requested was not part of the holding in *Goetz* and it appears only in a section tracing the history of New York's justification defense because it was used by a law reform commission in a report to the legislature in the 1930s. 68 N.Y.2d at 109. Petitioner's argument fails because New York law did not entitle him to the specific instruction he sought and, as noted, counsel is not ineffective for declining to pursue meritless claims. In any event, the instruction petitioner requested was substantively the same as the one he received, and he was therefore not prejudiced.

B. *Sufficiency of the Evidence Proving Intent*

A reasonable jurist could conclude that there was evidence sufficient to prove petitioner's intent to cause serious physical injury. Evidence is sufficient when "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). On habeas review, courts must apply AEDPA's deferential standard of review "to the state court's already deferential review" of the sufficiency of the evidence. *Cavazos v. Smith*, 565 U.S. 1, 7 (2011).

Petitioner's sufficiency claim would fail even if double deference did not apply. The jury could have disbelieved petitioner's testimony and found that he either (1) stabbed Richardson from the front before or after the bear hug, or (2) swung his scissors with the intent to cause serious physical injury while trying to struggle out of the bear hug. Indeed, the fact that petitioner picked up the scissors to use as a weapon was itself enough to support the intent finding, regardless of how events unfolded afterward. The jury's verdict was well-supported by the evidence, and the Appellate Division reasonably rejected this challenge.

C. *Prosecutorial Misconduct*

A reasonable jurist could conclude that the prosecution's comments during summation did not deprive petitioner of his right to a fair trial. As an initial matter, this claim was rejected as unpreserved, *Simpson*, 151 A.D.3d at 763, and is therefore procedurally defaulted. *Whitley v. Ercole*, 642 F.3d 278, 280 (2d Cir. 2011).

Moreover, the Appellate Division also reasonably held that the claim is without merit. On habeas review, prosecutorial misconduct claims are reviewed under the "narrow [standard] of due process," which warrants relief only if the "egregious misconduct" "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014) (internal quotations omitted). Petitioner complains that the prosecutor denigrated him personally by describing his remorse as "crocodile tears," derided his claim of self-defense as "ludicrous" and "impossible," and commented

on his pre-arrest silence after police arrived on the scene.  ECF No. 11-2 at 425, 428; ECF No. 16 at 41.  The trial court gave a curative instruction informing jurors that the statements about petitioner's pre-arrest silence were improper and must be disregarded.  ECF No. 11-2 at 448.  Even assuming that some of these remarks may have been improper, when "consider[ing] the record as whole," *Jackson*, 763 F.3d at 146, they were not nearly so egregious or harmful that they warrant habeas relief, particularly when the trial court gave a curative instruction as to some of them. Indeed, in my view the claim of self-defense in this case was fairly characterized as "ludicrous" and "impossible."  As previously noted, it seems to me that if anyone was acting in self-defense it was Richardson, who was trying to prevent petitioner from stabbing him with a pair of scissors over a set of headphones.

### III. CONCLUSION

The petition for relief pursuant to 28 U.S.C. § 2254 is denied.  A certificate of appealability is granted solely as to petitioner's claim of ineffective assistance of appellate counsel on the stop-deliberations issue (as discussed in section II.A.1 and its subsections).  A certificate of appealability is otherwise denied.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                    Edward R. Korman
August 27, 2021                          United States District Judge